# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 6, 2015

## STATE OF TENNESSEE v. ANTONIO HOWARD

**Appeal from the Criminal Court for Shelby County**
**No. 1202872     James M. Lammey, Judge**

_____

**No. W2014-02488-CCA-R3-CD  -  Filed May 26, 2016**

_____

Defendant, Antonio Howard, along with four co-defendants, was indicted by the Shelby County Grand Jury for six counts of aggravated rape, one count of especially aggravated robbery, two counts of aggravated robbery, and three counts of aggravated assault. Following a jury trial, he was convicted as charged following a jury trial.  The trial court merged counts 4-6 of aggravated rape with counts 1-3 of aggravated rape and sentenced Defendant to consecutive sentences of 25 years on each count.  The trial court merged Defendant's convictions for aggravated assault with his convictions for especially aggravated robbery and aggravated robbery and sentenced Defendant to consecutive sentences of 25 years for especially aggravated robbery and 12 years for each count of aggravated robbery.  The total effective sentence imposed was 124 years.  In this appeal as of right, Defendant raises the following issues for our review: 1) the evidence was insufficient to support his convictions, and the trial court erred by denying Defendant's motion for judgment of acquittal; 2) the trial court erred by imposing the maximum sentence within the applicable range and imposing consecutive sentencing; and 3) the trial court erred by allowing a co-defendant to testify wearing "street clothing," by allowing a victim to testify to "prejudicial, irrelevant and inflammatory information," and by not permitting Defendant to cross-examine a State's witness about the substance of her report.  Following a careful review of the record, we conclude that Defendant is not entitled to relief.  Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Charles S. Mitchell, Memphis, Tennessee, for the Appellant, Antonio Howard.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Josh Corman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

*Trial*

K.W., L.G., and C.C., the victims, were close friends for several years. On October 15, 2011, they went to Level 2, a nightclub in Memphis. They left the club at approximately 2:00 a.m. As they were walking to their car, L.G. asked two men if they had a cigarette lighter. Defendant handed a lighter to L.G.. The men asked if they could go hang out with the women, and K.W. agreed to let the men come to her apartment. The victims went to a convenience store to buy beer and Cigarellos and then returned to K.W.'s apartment. The victims straightened up the apartment and changed clothes before the men arrived.

K.W. testified that she was only expecting the two men from the parking lot to come, but instead, five men arrived at her apartment. She testified that everyone smoked marijuana and sat around and talked. She testified that "[e]verything was fine" until a gun fell out of Defendant's pocket onto the floor. She asked to see the gun, and Defendant put it on the table. She testified that she looked at the gun and Defendant "put it right back away" in his pocket. K.W. became afraid. She testified, "I was thinking in my head, okay, how do I get them out without being too forceful with it." She testified that a black gun fell out of co-defendant Brian Norwood's pocket. She told the men that it was getting late and asked everyone to leave. Defendant asked to use the bathroom. When he came out of the bathroom, "he had his gun drawn and he kind of grabbed [L.G.] and said this is a robbery." Defendant struck K.W. with his hand. He directed the victims to go to the living room and remove their clothing. K.W. testified that he struck her again with his gun, and she lost consciousness.

When K.W. regained consciousness, she saw two men standing beside the door. She testified, "all I can remember is coming to, asking I believe it was Brian I was just like help me, help me." She testified that she "feared for [her] life." She heard "moaning noises" coming from her bedroom. Defendant then came out of the bedroom and told Brian "to get the television, and Brian just told him that he didn't come here for that." Defendant then held his gun to K.W.'s face and told her, "'you think I won't use it,' saying in reference to shooting [her]." Defendant directed K.W. to get in the bathtub. K.W. and C.C. got L.G. from the bedroom, and all three women went into the bathroom. None of the women were wearing clothes. Once inside the bathroom, the victims locked the door and "prayed . . . [t]hat [they would] live through it." The victims stayed in the

2

bathroom for approximately ten minutes. When they came out of the bathroom, the front door was open. K.W. locked the door, and the victims put on their clothes. They then drove to L.G.'s mother's house, and L.G. called the police.

K.W. testified that she went to the emergency room for her injuries. She testified that the "whole side [of her face] was swole[n]." She testified that her eye was swollen and bruised, and it was painful. K.W. suffered "a fracture between [her] eye socket and [her] brain." She testified that she was unable to work for two months. She testified that a tv, a laptop, and a cell phone were taken from her apartment during the incident. K.W. gave a statement to the police. She also viewed a photographic lineup and identified Defendant as one of the men who came to her apartment. K.W. testified that she "didn't need any assistance" identifying Defendant as the man who hit her in the face.

L.G. testified that she and her friends were leaving the nightclub, and she asked a group of men standing nearby to borrow a cigarette lighter. One of the men asked if they could go with the women. K.W. told them that they could. They stopped at a convenience store on the way back to K.W.'s apartment. When they returned to the apartment, they smoked marijuana. L.G. and Defendant were both sitting at the table when she saw a gun fall out of Defendant's clothing. She testified, "me and Katrina instantly looked at each other and reacted, like, you know, it's time, it's time for them to go." She testified that Defendant picked up his gun, and then another man dropped a gun. She testified that the men stood up to leave, and Defendant asked to use the bathroom. When Defendant came out of the bathroom holding a gun, and "he was like, 'man, give me all y'all sh**.'" Defendant said to K.W., "'you think this a game, bitch?'" Defendant hit K.W. and told the women to get undressed. The victims took off their clothes. L.G. testified that she saw Defendant strike K.W. three times. After the third time Defendant struck her, K.W. fell unconscious. L.G. believed Defendant hit K.W. with the gun.

Defendant grabbed L.G.'s arm and spun her around. She testified, "he was, like, 'y'all like this?' And he made [her] give him oral sex right there . . . [i]n the living room in front of everybody." Defendant then took L.G. into the bedroom with another man. She testified that Defendant "made [her] continue to give him oral sex and made [her] give the other guy oral sex while [Defendant] got behind [her] and had sex with [her]." She testified that the other man ejaculated in her mouth. She testified that Defendant left the bedroom, and a third man came into the bedroom, and she was forced to give him oral sex as well. Defendant told the victims to get in the bathtub. She testified, "we got in the tub and we started praying. [K.W.] prayed out loud because they had left the door open." After the men left the apartment, the victims came out of the bathroom holding hairspray and brushes to defend themselves in case the men returned. They locked the door and got dressed.

3

The women could not call the police because the men had taken their cell phones. They went to L.G.'s mother's house and called the police. She testified that the police transported her to the Rape Crisis Center, where she was examined. L.G. gave a statement to the police. L.G. was also shown photographic lineups, and she identified Defendant as the person who raped her. She also identified one of the other men whom with she was forced to have oral sex.

Co-defendant James Kerrigan testified that he was Defendant's brother. He testified that two of the other co-defendants, Devan Denton and Leon Denton, were his nephews, and he met the other co-defendant, Brian Norwood, who he called "Pete," on the night of the incident. The men drove to Level 2 nightclub, and Mr. Kerrigan was denied entry because he was wearing tennis shoes. In the parking lot, they spoke to the victims. He testified they were "[j]ust having fun and exchanging numbers. And [Defendant] asked could we go back to their apartment." When they arrived at K.W.'s apartment, Defendant and Pete were seated at the table, and Mr. Kerrigan sat on the couch with Devan and Leon, listening to music. He testified that everyone was "just kicking it, having fun, talking, smoking. That's all it was."

He testified that everything changed when Defendant "came out waving that gun, told them 'you ingrates get on the ground.'" Mr. Kerrigan saw Defendant carrying a gun earlier at the nightclub. Mr. Kerrigan testified that Defendant told the women "to give [him] everything [and] get on the ground." He testified that K.W. "staggered around with a smirk, like, 'are you for real[?]'" and Defendant struck her in the face. He testified that Defendant struck her three times. He testified that Defendant told the victims "to get naked." Defendant then "showed the medium size female off, asked did we like what we see." Mr. Kerrigan testified that he and the other men told Defendant, "no, we don't get down like that." Defendant then "commanded her to perform oral sex." Defendant was holding the gun while L.G. performed oral sex on Defendant in the living room. Defendant then led her to the bedroom. Defendant took Leon into the bedroom with them. Mr. Kerrigan heard moaning coming from the bedroom. He told Devan that the men were raping L.G.. Devan went to the bedroom door and told Defendant that he and Mr. Kerrigan were going to leave, and Defendant told them, "'ain't nobody going nowhere until I get what I want.'" When Devan opened the door to the bedroom, Mr. Kerrigan saw Defendant raping the victim from behind while she was on her hands and knees in the floor being forced to perform oral sex on Leon.

Defendant came out of the bedroom and "start[ed] waving the gun and told [them] to get the TVs before he pop something off in [t]here." Mr. Kerrigan placed the televisions by the couch. Devan went into the bedroom and L.G. was forced to engage in oral sex with him. The other two victims were in the living room with Mr. Kerrigan. He

4

testified that K.W. began to regain consciousness, and she was "just coming back getting up making noise saying she needed some air. She couldn't breathe." C.C. got an icepack for K.W. K.W. told the men "to take everything, she just want[ed] her and her friends to be safe." Mr. Kerrigan told the women he did not have anything "to do with it." After Defendant came out of the bedroom, he put the gun to K.W.'s head and told her, "'bitch, I'll kill you.'" Mr. Kerrigan testified, "[t]hat's when I stepped in front of him. I told him I couldn't let him do it. [Defendant] shoved [him] out of the way." Devan stood in front of Defendant "and told him that he wasn't fixing to let him kill this girl." Defendant then told the women to get in the bathtub, and the men left the apartment. Defendant told Mr. Kerrigan to get one television and three cell phones, he told Leon to get one television, and Defendant took a computer. Mr. Kerrigan gave the television and cell phones to his cousin to sell, and Mr. Kerrigan kept some of the proceeds. Mr. Kerrigan was later arrested, and he gave a statement to the police consistent with his testimony at trial. Mr. Kerrigan was 16 years old at the time of the offenses. He testified that he only participated "[o]ut of fear."

Brian Norwood testified that he went with Defendant, Devan Denton, Leon Denton, and Mr. Kerrigan to Level 2 nightclub. Mr. Norwood testified that he went by the nickname "Pete." He testified that they met the victims in the parking lot and made plans to hang out with them. They followed the victims to their apartment. He testified they "were just in there having a good time drinking and smoking, talking or whatever." He testified that Defendant's gun slipped out of his pocket, and one of the victims asked about it. Defendant showed her the gun and put it away. Mr. Norwood testified that he also had a gun. He testified that Defendant told him in the parking lot to bring his gun inside the apartment because they did not know the victims, and he "probably need[ed] to bring [his] gun in so [he] did." He testified that his gun fell out of his pocket, and the victims appeared scared. Mr. Norwood told them they were going to leave, and Defendant pulled out his gun, pointed it at the victims, and told them they were taking their televisions. Mr. Norwood did not believe Defendant was serious. Defendant then hit one of the victims. Defendant hit K.W. twice more, and she fell to the floor. She appeared to be unconscious and was wheezing and gasping for air.

Defendant then told the victims to undress, and he grabbed L.G.'s arm "and twirled her around and said 'y'all like what y'all see?'" Mr. Norwood testified that he had never seen Defendant act that way. Mr. Norwood told Defendant to "chill the f*** out." Defendant forced L.G. to engage in oral sex on him in the living room in front of everyone. Mr. Norwood testified that he was standing by the front door. Defendant then took L.G. into the bedroom and told Leon to go with them. Mr. Norwood did not see or hear what happened in the bedroom, "but [he] pretty much knew what was going on." While Defendant was in the bedroom, K.W. regained consciousness, and C.C. brought her some ice. When Defendant came out of the bedroom, he told Mr. Norwood to grab a

television.  Mr. Norwood initially refused, and Defendant said "'you gonna make me shoot one of these bitches.'"  Defendant pointed the gun at K.W.'s face, and one of the other men stopped him.  Defendant then told the men to take the televisions, and he ordered the victims into the bathtub.  Defendant carried one of the televisions.  Mr. Norwood told the men not to put the stolen property in his truck, but Defendant loaded the items anyway.  Mr. Norwood drove Defendant to his apartment.  Defendant offered to give Mr. Norwood money from the sale of the stolen items, and Mr. Norwood told him that he did not want it.

On the following day, Mr. Norwood saw Devan Denton at a friend's house.  Defendant called Mr. Norwood and accused him of having told Defendant's sister, who is Devan's mother, about what happened the previous night.  Defendant told Mr. Norwood that he knew "how to lay low" and "[s]nitches get killed."  Mr. Norwood called his father, a police officer, and told him what happened.  Mr. Norwood and Devan Denton went to the police station together to report the crimes.  Mr. Norwood gave two statements to the police.

C.C. testified that she did not drink alcohol on the night of the incident because she was the designated driver.  She described the events of the night consistently with the other victims' testimony.  She also gave a statement to the police about the incident and identified Defendant in a photographic lineup.

Memphis police officers photographed the crime scene.  Officers found women's clothing in the living room floor of K.W.'s apartment.  Officers tracked the victims' cell phones to James Kerrigan.  Mr. Kerrigan provided the police with the names of Defendant, Leon Denton, Devan Denton, and "Pete."

Margaret McCallum, a family nurse practitioner, examined L.G. after the incident.  L.G. told Ms. McCallum that she had been forced to give oral sex to three men.  She stated that someone she identified to Ms. McCallum as "KP" raped her vaginally from behind while she was forced to engage in oral sex on one of the other men, who ejaculated in her mouth, and Defendant ordered her to swallow the ejaculate.  Ms. McCallum collected swabs from L.G.'s mouth, vagina, and anal area.

By stipulation between the parties, a lab report by the Tennessee Bureau of Investigation was admitted into evidence.  The report showed that Leon Denton's DNA was matched to L.G.'s rape kit.

Defendant did not testify or present any other proof at trial.

6

*Analysis*

*Sufficiency of the evidence*

Defendant contends that the evidence was insufficient to support his convictions. Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded on other grounds by* Tenn. R. Crim. P. 33 *as stated in State v. Moats*, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. *Id*. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted). A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Defendant contends that the evidence was insufficient to sustain his conviction for especially aggravated robbery because the State failed to establish that K.W. suffered serious bodily injury. Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Serious bodily injury means bodily injury involving a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member or organ. T.C.A. § 39-11-106 (a)(34).

Defendant argues that no medical evidence was presented concerning K.W.'s treatment, and there was insufficient proof to establish how long K.W. was unconscious. The State responds that no such proof is required to sustain Defendant's conviction, and the victim suffered protracted loss of vision in one eye, constituting serious bodily injury.

7

Defendant relies on *State v. Sims*, in which this court held that the evidence of the victim's injuries was insufficient as a matter of law to support a finding of serious bodily injury based on extreme physical pain or protracted or obvious disfigurement. 909 S.W.2d 46, 49-50 (Tenn. Crim. App. 1995). In *Sims*, the victim was struck in the face with a pistol one time. *Id*. at 48. As a result, she had a broken and swollen nose, a bruised cheekbone, two black eyes, and a cut across the bridge of her nose. *Id*. She testified that she experienced extreme physical pain on her face and nose. *Id*. During a hospital visit that lasted approximately two hours, a doctor treated the victim with a surgical band-aid to close the laceration, and she was not prescribed pain medication. *Id*. at 49. The victim also testified that she consulted a plastic surgeon about the cut on her face, but she did not undergo plastic surgery. *Id*. at 48. She missed five weeks of work because of her injuries. *Id*. Construing the meaning of "extreme physical pain" in light of the other statutory factors that constitute serious bodily injury, this court stated, "We do not believe that the pain commonly associated with a broken nose is extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." *Id*. at 49. Although this court acknowledged "the difficulty of quantifying or measuring pain," we concluded that the evidence was insufficient to support the element of serious bodily injury based on extreme physical pain or protracted or obvious disfigurement. *Id*. at 49-50. Accordingly, the court modified the defendant's conviction to aggravated robbery. *See* T.C.A. § 39-13-402(a)(1).

The Tennessee Supreme Court discussed the statutory definition of "serious bodily injury" when it addressed whether a gunshot wound that passed through the victim's leg constituted "serious bodily injury." *See State v. Farmer*, 380 S.W.3d 96, 100-03 (Tenn. 2012). The court ultimately concluded that the gunshot wound did not meet the statutory definition of "serious bodily injury" because the injury, as it occurred, did not involve a substantial risk of death, the victim did not lose consciousness, the victim did not suffer extreme pain, and nothing in the victim's testimony supported an inference that his injury involved protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. *See id*. In *Farmer*, our supreme court cited with approval this court's opinion in *Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995).

The State cites *State v. Thomas D. Stanton*, No. M2003-03049-CCA-R3-CD, 2005 WL 639139, at *7 (Tenn. Crim. App., March 17, 2005), *perm. app denied* (Tenn., Aug. 22, 2005). In that case, the proof showed that the defendant "beat the victim severely." *Id*. "The victim suffered numerous blows to his face, back and legs." He was dragged through a wooded area, which caused large abrasions on both knees. He suffered "excruciating" pain in his back and was administered pain medication at the hospital. A

8

panel of this court concluded that the victim suffered serious bodily injury. Specifically, the panel held:

> The victim testified that he could not use his left eye for a week and a half after the assault. We have no difficulty concluding that the loss of vision from one eye for over a week constitutes a "protracted loss or substantial impairment of a function of a bodily . . . organ." Moreover, the victim also testified that his mobility was seriously limited during the several weeks following the assault. This, too, constitutes "the protracted loss or substantial impairment of a function of a bodily member," that is, the victim's legs and back. Finally, the victim testified that he suffered permanent scarring below his left eye, and the jury had the opportunity to view the victim's face. A scar on the face is an "obvious disfigurement."

*Id*. (citation omitted).

The State also cites *State v. Christopher Alan White*, No. E2002-00716-CCA-R3-CD, 2003 WL 21276123, at *8 (Tenn. Crim. App., Jan. 22, 2003), *no perm. app. filed*. In that case, a panel of this court concluded that the evidence was sufficient to support a finding of serious bodily injury where,

> the victim testified that she was hit, punched, slapped, kicked, bitten, and knocked around by the defendant over the course of approximately thirty-six hours. During this time, the victim repeatedly escaped outside to vomit or cough up blood. She often begged the defendant to stop the beating or to move to other rooms in their home in order to avoid additional injury or to draw him away from their child. She said the defendant applied ice packs to her injuries yet resumed the beating. She testified that as a result of the beating, she felt a searing pain that was worse than the pain of childbirth. Regarding her injuries, the victim testified that she could not see out of her swollen left eye for a month and continued to experience periods of double vision or blindness in that eye. Dr. Kiriluk testified that the victim's eye injury presented a substantial risk of death in that a bone fragment from her fractured orbit could have penetrated her brain.

In *State v. Eddie Leroy Rowlett*, No. M2011-00485-CCA-R3-CD, 2013 WL 749502, at *16 (Tenn. Crim. App., Feb. 26, 2013), another panel of this court concluded that the victim's loss of vision for one night and swollen shut eye did not constitute a "protracted loss or substantial impairment of a function of a bodily member, organ or

9

mental faculty." The panel noted that protracted means "'delayed or prolonged in time.'" *Id.* (quoting *State v. David Earl Scott*, No. E2011-00707-CCA-R3-CD, 2012 WL 5503951, at *6 (Tenn. Crim. App., Nov. 14, 2012)). The panel also held that the evidence did not support a conclusion that the function of the victim's bodily members was substantially impaired because the victim was able return to work immediately.

We note that in both cases relied upon by the State, the severity of the victims' injuries was more apparent than in the case before us. The State only cites the cases for the victims' swollen eyes and impaired vision, and the State does not mention the other injuries suffered by those victims or the length or severity of the beatings of those victims. While the proof of serious bodily injury in the present appeal was not overwhelming, taken in the light most favorable to the State, the victim testified that Defendant struck her in the face with his gun three times, knocking her unconscious. When she regained consciousness, she gasped for air and complained that she could not breathe. She was transported by the police to the hospital for treatment. She testified that she suffered a fracture between her eye socket and her brain. Photographs of the victim's face were admitted into evidence and shown to the jury. The photographs confirmed the victim's eye was bruised and swollen shut. She suffered dizziness, loss of vision, and severe pain. She testified that she was unable to return to work for two months.

"The distinction between 'bodily injury' and 'serious bodily injury' is generally a question of fact for the jury and not one of law." *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). We conclude that the evidence supports the jury's finding that the victim's injuries met at least two of the statutory factors necessary to elevate the injuries from "bodily injury" to "severe bodily injury," because the victim's loss of vision was protracted and was also a substantial impairment of a function of a bodily organ. Therefore, Defendant is not entitled to relief on this issue.

Defendant contends that the State failed to present sufficient evidence to sustain his aggravated rape convictions. Aggravated rape is the unlawful sexual penetration of a victim by the defendant accompanied by force or coercion and the defendant is armed with a weapon, or where the defendant is aided or abetted by one or more other persons and force or coercion is used to accomplish the act. T.C.A. § 39-13-502(a). Sexual penetration includes sexual intercourse or fellatio. T.C.A. § 39-13-501(7).

Defendant argues that Mr. Kerrigan's testimony should not have been accredited because it was impossible for him to see into the bedroom "from the other side of the apartment." Defendant also argues that the evidence was insufficient because his DNA was not found on L.G..

10

Factual issues raised by the evidence are resolved by the trier of fact, and appellate courts do not reweigh or reevaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). The proof established that K.W.'s apartment was a small, one-bedroom apartment. We do not agree with Defendant's contention that it was "wholly impossible" that Mr. Kerrigan could see into the bedroom. The jury chose to accredit this testimony, as was its prerogative. Defendant's argument also ignores L.G.'s testimony that Defendant, holding a gun, took her into the bedroom and forced her to perform oral sex on Leon Denton while Defendant sexually penetrated her vagina from behind. By its verdict, the jury also accredited the victim's testimony. It is not the function of this court to reweigh evidence or re-evaluate credibility determinations made by a jury. *Id*. We conclude that the evidence was sufficient to support Defendant's aggravated rape convictions.

Defendant contends that the evidence was insufficient to sustain his conviction for aggravated robbery. Aggravated robbery is robbery "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon, or where the victim suffers serious bodily injury." T.C.A. § 39-13-402. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a).

Defendant argues that the evidence was insufficient because K.W. testified that she did not know who removed the items from the apartment. However, L.G. and C.C. both testified that Defendant ordered Mr. Norwood to grab the television, and Mr. Norwood told Defendant that he did not "come here for that." Mr. Kerrigan and Mr. Norwood both testified that Defendant ordered the men to grab the televisions. Mr. Norwood testified that Defendant left the apartment carrying one of the televisions and put it in Mr. Norwood's truck against his protests. We conclude that the evidence supports Defendant's aggravated robbery convictions.

Defendant contends that the evidence was insufficient to support his conviction for aggravated assault. Aggravated assault is committed when a person "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [u]ses or displays a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(B). A person commits assault who "intentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" T.C.A. § 39-13-101(a)(2).

Defendant argues that the State failed to prove that he intentionally or knowingly caused reasonable fear of imminent bodily injury because K.W. did not display fear when Defendant's gun fell out of his pocket. Instead, she asked to see the gun, and "everyone [then] went back to smoking and hanging out." As the State points out, Defendant's argument ignores the series of violent events that occurred after that exchange.

11

Defendant argues that the jury "should have disregarded the State's proof" because of conflicting testimony regarding the sequence of events. As we stated earlier in this opinion, the resolution of factual issues and the credibility of witnesses is for the jury to determine, and this court will not reweigh the evidence on appeal. *Evans*, 108 S.W.3d at 236.

In the light most favorable to the State, the evidence showed that the women asked Defendant and the other men to leave the apartment. Defendant then asked to use the restroom. When Defendant came out of the bathroom, he waved his gun around and announced, "this is a robbery." He demanded that the women undress, and he hit K.W. three times before she lost consciousness. The victims testified that they feared for their lives. The evidence is sufficient to support Defendant's aggravated assault conviction.

Finally, Defendant contends that the trial court erred by denying his motion for judgment of acquittal. A trial judge may direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See* Tenn. R. Crim. P. 29(a); *see generally Overturf v. State*, 571 S.W.2d 837 (Tenn. 1978). The standard by which the trial court determines a motion for judgment of acquittal at that time is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994).

In his brief argument on this issue, Defendant restates his contention that the evidence was insufficient because the victims could not see who removed the items from the apartment because they were in the bathroom when Defendant and the other men left. Defendant also restates his contention that K.W. could not have been in fear for her life because she asked to see Defendant's gun and continued to smoke marijuana after the gun fell out of Defendant's pocket. Defendant also argues that his convictions should be reversed because the victims were shown only three or four photographic lineups although there were five suspects.

Defendant's argument does not acknowledge that all three victims identified him in photographic lineups; nor does Defendant's argument acknowledge that the victims were placed in fear when Defendant came out of the bathroom waving a gun and announced that he was robbing the victims, hit K.W. in the face three times, and forced L.G. to perform oral sex on him. We conclude that the evidence overwhelmingly supports Defendant's guilt. Defendant is not entitled to relief on this issue.

12

*Length of sentence*

Defendant contends that the trial court erred by imposing the maximum sentence within the appropriate range. Specifically, Defendant argues that the trial court should not have applied certain enhancement factors and failed to properly weigh certain mitigating factors. Defendant also contends that the trial court erred by imposing consecutive sentencing. The State responds that under the *Bise* standard of review, Defendant's challenge to his sentence is without merit.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement and mitigating factors are *advisory only*. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select *any sentence within the applicable range* so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act]." *Id.* at 343 (emphasis added). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

In *Bise*, our supreme court held:

> We hold, therefore, that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court *wholly departed* from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

*Bise*, 380 S.W.3d at 706 (emphasis added). In its conclusion, the supreme court pointed out that in sentences involving misapplication of enhancement factors (even in those

13

cases where no enhancement factor actually applies) the sentences must still be affirmed if the sentences imposed are within the appropriate range, and the sentences are in compliance with statutory sentencing purposes and principles. *Id*. at 710.

Our General Assembly has enacted twenty-five (25) statutory sentencing enhancement factors; however, they are not binding upon the trial courts. T.C.A. § 40-35-114 (Supp. 2015). As previously noted, the weighing of mitigating and enhancement factors is left to the trial court's discretion, *Carter*, 254 S.W.3d at 345, and in fact the trial court's weighing of enhancement or mitigating factors is not a ground for appellate relief. *Id*.; T.C.A. § 40-35-401(b). The standard of review established in *Bise* provides that the minimum sentence can be imposed even if the trial court correctly applies all twenty-five enhancement factors, or conversely the maximum sentence can be imposed even if no statutory enhancement factors are applicable, so long as the sentence is within the correct range and the sentence complies with the sentencing purposes and principles. Accordingly, appellate review of enhancement factor issues is arguably superfluous when reviewing the length of a sentence.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. T.C.A. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

The applicable sentencing range for a Range I offender convicted of a Class A felony is 15 to 25 years, and for a Class B felony is 8 to 12 years. T.C.A. § 40-35-

14

112(a)(1)-(2). The trial court imposed the highest sentence within each range for each of Defendant's convictions.

At the sentencing hearing, the presentence report was admitted into evidence. The parties did not present any witness testimony or other evidence. Following the arguments of counsel, the trial court found that Defendant had "a poor upbringing," but the court declined to apply this as a mitigating factor, finding that Defendant's difficult childhood did not serve to justify his actions.

The trial court explained in great detail the factors that it considered in sentencing Defendant. The court found as enhancement factors that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; that he was a leader in the commission of an offense involving two or more criminal actors; that the victim L.G. was treated with exceptional cruelty during the commission of the offense; that L.G. suffered enormous injuries as a result of the aggravated rape; that the offense was committed to gratify Defendant's desire for pleasure or excitement; that Defendant was released on bond for another crime at the time he committed the offenses in this case; that Defendant possessed a firearm during the commission of the rapes; that Defendant intentionally inflicted serious bodily injury upon another or that his actions resulted in serious bodily injury to another.

With regard to enhancement factor (9), that Defendant possessed a firearm during the commission of the rapes, the trial court noted that "[i]t wasn't an element of the three aggravated rapes [in counts] four, five[,] and six[.]" In counts 1-3, the indictment alleged that Defendant committed aggravated rape "while armed with a weapon," and counts 4-6 of the indictment alleged that Defendant committed aggravated rape "by the use of force or coercion" while aided or abetted by one or more other persons. However, the judgments reflect that counts 4-6 were merged into counts 1-3. Therefore, the trial court's application of enhancement factor (9) was error because it was an element of the offenses. Nevertheless, as stated above, even if a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination as long as the sentence is within range and otherwise complies with the sentencing guidelines. *Bise*, 380 S.W.3d at 709. Therefore, because the trial court properly considered the evidence offered by the parties, stated on the record what enhancement and mitigating factors were considered, and gave appellant a within range sentence, the trial court did not abuse its discretion in enhancing Defendant's sentence.

Relative to consecutive sentencing, the trial court found that Defendant's actions were those "of an extremely dangerous offender." The trial court explained:

15

Here we had a situation where the defendant befriended some young ladies and by fraud managed to weasel his way into their home and then forever changed their life. I believe that is the case, that he is a dangerous offender. . . .

So he weaseled his way in and then basically mentally tortured all of them by use of a handgun. They tried their best to get these people out of their house but to no avail. You know, it's almost something you'd see in a horror movie.

The circumstances surrounding this offense are particularly aggravated. The fact that he humiliated them on top of everything else, caused them to strip down and stand in the middle of the room, paraded them around, had one of them perform oral sex on him in front of everyone else, physically assaulting one with a pistol, saying some crude remarks while he was going about it, just everything points to the fact that this man is a dangerous offender. God help us if he ever gets out on the street again.

So I believe that the aggregate length of the sentence reasonably relates to the offense for which the defendant stands convicted.

Our supreme court has also extended the standard of review enunciated in *State v. Bise*, abuse of discretion with a presumption of reasonableness, to consecutive sentencing determinations. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115(b)(1)-(7). One of those factors is that, "The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. 40-35-115(b)(4). In order to find that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" *State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App.1996) (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), -103(2) (2014); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

16

The record shows that the trial court made the additional factual findings required to determine that the Defendant was a dangerous offender pursuant to the holding in *Wilkerson*. In considering whether to impose consecutive sentences, the trial court found, "everything points to the fact that this man is a dangerous offender." The trial court implicitly found that consecutive sentencing was necessary to protect the public from further misconduct by Defendant when it stated, "God help us if he ever gets out on the street again." Additionally, the trial court emphasized the serious nature of the offenses involved, stating that "the aggregate length of the sentence reasonably relates to the offense[s] for which [D]efendant stands convicted." Thus, we conclude that the trial court properly exercised its discretion in ordering the Defendant to serve his sentences consecutively.

The record reflects that the trial court carefully considered the evidence, the nature of the criminal conduct involved, the presentence report, and the purposes and principles of sentencing prior to imposing consecutive, within-range sentences of confinement. The Defendant's sentence is justly deserved considering the severity of his offenses. Therefore, the Defendant has failed to establish that the trial court abused its discretion in imposing his sentences and he is not entitled to relief.

*Challenges to admission of witness testimony*

Defendant contends that the trial court erred by allowing his co-defendant to testify while wearing street clothing, by allowing a victim to testify that she prayed for her life because she was afraid of being killed, and by limiting Defendant's cross-examination of a detective. The State argues that Defendant has waived these issues by failing to file a timely motion for new trial.

A motion for new trial "shall be made . . . within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). "[T]his thirty-day period is jurisdictional and cannot be expanded." *State v. Hatcher*, 310 S.W.3d 788, 800 (Tenn. 2010) (citations omitted). Defendant acknowledges in his brief that his motion for new trial was not timely filed, and the record supports this concession. Accordingly, these issues are waived. *See* Tenn. R. App. P. 3(e) (stating that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial").

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

17